# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **TINA M. GRUBB-HALL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv00036 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Tina M. Grubb-Hall, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

-1-

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Grubb-Hall protectively filed her applications for DIB and SSI[1] on or about June 2, 2000, alleging disability as of March 27, 2000, based on nerves, stress, depression, back problems and headaches. (Record, ("R."), at 4, 55-57, 66, 88.) The claims were denied initially and upon reconsideration. (R. at 4, 33-35, 36, 38-39.) Grubb-Hall then requested a hearing before an administrative law judge, ("ALJ"). (R. at 40.) The ALJ held a hearing on August 8, 2001, at which Grubb-Hall was represented by counsel. (R. at 308-60.)

By decision dated November 8, 2001, the ALJ denied Grubb-Hall's claims. (R. at 15-25.) The ALJ found that Grubb-Hall had not engaged in substantial gainful activity since March 27, 2000. (R. at 23.) The ALJ also found that the medical evidence established that Grubb-Hall suffered from severe impairments, namely a panic disorder and a depressive disorder, but he found that Grubb-Hall did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ found that Grubb-Hall's allegations were not credible. (R. at 23.) The ALJ found that Grubb-Hall retained the residual functional capacity to perform work at all exertional levels. (R. at 24.) The ALJ also found that Grubb-Hall was markedly limited in her ability to deal

---

[1]The record indicates that the exhibits for Grubb-Hall's SSI application are unavailable for inclusion. (R. at 4.)

with work stress, to maintain attention and concentration, to use judgment, to function independently, to relate predictably in social situations, to behave in an emotionally stable manner and to interact appropriately with the public from March 27, 2000, through April 30, 2001. (R. at 24.) In addition, the ALJ found that beginning May 1, 2001, Grubb-Hall, because of medical improvement, was markedly limited in her ability to interact with the public, that she was moderately to markedly limited in her ability to understand, remember and carry out detailed or complex instructions, moderately limited in the ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual, to sustain an ordinary routine without supervision, to work with or near others without being distracted by them, to complete a normal workday or work week, to perform at a consistent pace, to interact appropriately with co-workers, to respond appropriately to work pressures in a usual work setting, and that she was mildly to moderately limited in her ability to make simple work-related decisions and to interact appropriately with supervisors. (R. at 24.) Thus, the ALJ found that Grubb-Hall could not perform any of her past relevant work. (R. at 24.) Based on Grubb-Hall's age, education and work history and the testimony of a vocational expert, the ALJ concluded that effective May 1, 2001, Grubb-Hall could perform jobs existing in significant numbers in the national economy. (R. at 24.) Thus, the ALJ found that Grubb-Hall was disabled from March 27, 2000, through April 30, 2001, but that she was not disabled under the Act thereafter. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his decision, Grubb-Hall pursued her administrative appeals, (R. at 11), but the Appeals Council denied her request for review. (R. at 6-

10.) Grubb-Hall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Grubb-Hall's motion for summary judgment filed September 19, 2005, and the Commissioner's motion for summary judgment filed October 24, 2005.

## *II. Facts*

Grubb-Hall was born in 1960, (R. at 55), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). Grubb-Hall has a high school education and past relevant work experience as a store owner, a cashier, a security guard, a receptionist and a factory worker. (R. at 67, 314.)

Marshall Tessnear, Ph.D., a psychological expert, testified at Grubb-Hall's hearing. (R. at 337-51.) Tessnear stated that, based upon his review of the medical evidence, he would diagnose a panic disorder and a depressive disorder, not otherwise specified. (R. at 339.) He stated that Grubb-Hall had at least one episode of decompensation which required her to leave a job and that it was possible that she had experienced two episodes. (R. at 339.) Tessnear stated that Grubb-Hall had been impaired for longer than 12 months, but according to the treatment notes, she appeared to be responding to current treatment. (R. at 341-42.) He stated that he would still expect Grubb-Hall's impairments to continue for 12 months. (R. at 341-42.) He completed a mental assessment indicating that the limitations indicated therein were in effect beginning May 2001. (R. at 244-46, 346.) He stated that some of Grubb-Hall's limitations may improve, that some may stay the same and that he saw no evidence of continued deterioration. (R. at 346.)

Jean Hambrick, a vocational expert, also testified at Grubb-Hall's hearing. (R. at 352-59.) Hambrick was asked to consider an individual of Grubb-Hall's age, education and work experience, who had the residual functional capacity as indicated by Tessnear. (R. at 244-46, 355.) Hambrick stated that there were jobs available that such an individual could perform, including those of a laundry worker, a cleaner and a kitchen helper. (R. at 355.)

In rendering his decision, the ALJ reviewed reports from Dr. Ralph O. Dunker Jr., M.D.; Twin County Regional Hospital; Howard Leizer, Ph.D., a state agency psychologist; Hugh Tenison, Ph.D., a state agency psychologist; Wythe Medical Associates, Behavioral Health Care Center; Wythe County Community Hospital; Mount Rogers Mental Health Center; Brock Hughes Free Clinic; Southwestern Virginia Mental Health Institute; Elizabeth Gonda, D.P.M., a podiatrist; and Marshall Tessnear, Ph.D., a licensed psychologist. Grubb-Hall's attorney also submitted medical reports from Mount Rogers Mental Health Center and Wythe Medical Associates to the Appeals Council.[2]

On July 15, 1991, Grubb-Hall saw Dr. Ralph O. Dunker Jr., M.D., for complaints of right hip and leg pain.[3] (R. at 101-02.) On examination, Grubb-Hall was able to walk on her heels and toes, and she had no weakness in her lower extremities. (R. at 102.) Straight leg raising tests were positive on the right. (R. at 102.) An MRI

---

[2]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-10), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[3]This is the only medical report contained in the record pertaining to hip and leg pain.

showed a herniated disc at the T12-L1 level on the right side and a herniated disc at the L5-S1 level on the right.[4] (R. at 102.) She was sent for physical therapy and advised to take Advil. (R. at 102.)

The record shows that Grubb-Hall was admitted to Twin County Regional Hospital on November 5, 1994, for displaying bizarre behavior. (R. at 103-11.) It was reported that she had been riding around town with a large knife in her front seat thinking about hurting herself. (R. at 103.) She reported that her boyfriend of nine years had left her. (R. at 103.) She was discharged on November 18, 1994, with a diagnosis of adjustment disorder with depressed mood and suicidal ideation and dependent personality traits. (R. at 105.) On October 16, 1996, Dr. Jane Jackson, M.D., advised Grubb-Hall to terminate her employment due to the severely high stress level. (R. at 112.) Grubb-Hall was diagnosed with an adjustment disorder with depressed mood. (R. at 112.) On June 14, 2000, Dr. James P. Robinson, M.D., reported that Grubb-Hall suffered from a severe panic disorder. (R. at 113.) He reported that Grubb-Hall was unresponsive to various treatment attempts, which prevented gainful employment. (R. at 113.)

The record indicates that Grubb-Hall received treatment from Behavioral Health Care Center from April 1996 through October 2000 for depression and anxiety. (R. at 173-88.) On April 4, 1996, Grubb-Hall complained of depression and anxiety as a result of a stressful job, a death in the family and the breakup with her boyfriend. (R. at 187.) She stated that she had been consuming 12 beers on the weekends. (R. at 187.) She stated that she no longer consumed alcoholic beverages because it made her

---

[4]The record does not contain any additional evidence pertaining to Grubb-Hall's back.

more depressed. (R. at 187.) She was diagnosed with an adjustment disorder with depression and anxiety. (R. at 187.) In June 2000, Grubb-Hall reported that she was "skittish of people" and that her "nerves" and stress made it difficult to keep a job. (R. at 176.) She was diagnosed with a panic disorder and advised to file for disability. (R. at 176.) In October 2000, Grubb-Hall complained of anxiety attacks with dizziness, nausea and labored breathing. (R. at 173.)

On August 1, 2000, Howard Leizer, Ph.D., a state agency psychologist, indicated that Grubb-Hall was moderately limited in her ability to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to respond appropriately to changes in the work setting and to set realistic goals or to make plans independently of others. (R. at 114-15.) He indicated that Grubb-Hall was not significantly limited or showed no evidence of limitation in all other areas. (R. at 114-15.)

Leizer also completed a Psychiatric Review Technique form, ("PRTF"), indicating that a residual functional capacity assessment was necessary. (R. at 118-31.) He indicated that Grubb-Hall suffered from an anxiety-related disorder. (R. at 118.) Leizer reported that Grubb-Hall was slightly restricted in her activities of daily living and in maintaining social functioning. (R. at 127.) He reported that she occasionally had deficiencies of concentration, persistence or pace and never experienced episodes of deterioration in the work place. (R. at 127.) Leizer reported that Grubb-Hall's symptom-related limitations would be expected to permit unskilled,

nonstressful substantial gainful activity with treatment. (R. at 130.)

On October 6, 2000, Hugh Tenison, Ph.D., a state agency psychologist, reported that Grubb-Hall was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention/concentration and to complete a normal workday and work week without interruptions. (R. at 132-35.) Tenison indicated that Grubb-Hall was not significantly limited or showed no evidence of limitation in all other areas. (R. at 132-33.) He reported that Grubb-Hall was able to perform simple, unskilled work with mild to moderate limitations in her ability to remember and carry out detailed instructions and to persist in work tasks. (R. at 134.)

Tenison also completed a PRTF indicating that Grubb-Hall suffered from a severe impairment, but that it was not expected to last 12 months. (R. at 136-49.) He indicated that a residual functional capacity assessment was necessary. (R. at 136.) Tenison reported that Grubb-Hall suffered from an affective disorder. (R. at 136.) He reported that she was moderately restricted in her activities of daily living. (R. at 146.) Tenison reported only mild limitations in her ability to maintain social functioning and moderate limitations in her ability to maintain concentration, persistence or pace. (R. at 146.) He indicated that Grubb-Hall had experienced one or two episodes of decompensation. (R. at 146.) Tenison reported that Grubb-Hall would be able to perform simple, unskilled work after receiving 12 months of adequate treatment. (R. at 148.)

The record indicates that Grubb-Hall received treatment from Mount Rogers Mental Health Center from October 2000 through April 2002 for depression and

-8-

anxiety. (R. at 196-204, 209-11, 223-43, 247-84.) On November 29, 2000, Grubb-Hall reported that she experienced panic attacks almost daily. (R. at 199.) She reported that she would become anxious around crowds and that she avoided going to public places. (R. at 199.) She was diagnosed with panic attacks with agoraphobia, social phobia and major depression. (R. at 200.) That same day, Dr. Maria C. Abeleda, M.D., reported that Grubb-Hall was being treated for panic attacks, severe anxiety and social phobia and was unable to work. (R. at 211.) On February 26, 2001, Judy Fiebig, M.A., completed a mental assessment indicating that Grubb-Hall had a more than satisfactory ability to follow work rules and to relate to co-workers. (R. at 209-10.) She found that Grubb-Hall had a limited, but satisfactory, ability to interact with supervisors, to understand, remember and carry out complex, detailed and simple instructions, to maintain personal appearance and to demonstrate reliability. (R. at 209-10.) Fiebig found that Grubb-Hall was seriously limited, but not precluded, in her ability to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention/concentration, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 209-10.) Dr. Abedela signed the assessment on March 28, 2001. (R. at 210.) The record shows that Fiebig assessed Global Assessment of Functioning, ("GAF"), scores[5] ranging from 60-66[6] during the period of February 2001 through July 2001. (R. at 224-30.) On March 22,

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6]A GAF of 60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32. A GAF of 61-70 indicates that the individual has "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

-9-

2001, Grubb-Hall reported that she was quite depressed with some suicidal ideations. (R. at 238.) She was hospitalized to stabilize her condition. (R. at 238.) On April 19, 2001, Grubb-Hall reported that she was doing fairly well, but was having more mood swings, irritability and anxiety. (R. at 236.) Dr. Abeleda diagnosed bipolar disorder, mixed type, most recent episode depressed, panic attacks with agoraphobia and social phobia. (R. at 236.) In May 2001, Grubb-Hall reported that her mood was more stable and she was less irritable. (R. at 235.) Dr. Abeleda reported that Grubb-Hall's affect was full and her mood was bright and stable. (R. at 235.) Grubb-Hall was slightly anxious. (R. at 235.) Her insight was fair and memory and judgment were intact. (R. at 235.) In June 2001, Fiebig reported that Grubb-Hall was obviously anxious and depressed. (R. at 225.) She reported sleep disturbance and a decrease in her ability to concentrate. (R. at 225.) On October 10, 2001, Grubb-Hall reported that she was doing much better on medication. (R. at 284.) She reported that she was no longer having mood swings, depression or suicidal ideations. (R. at 284.) On December 5, 2001, Grubb-Hall reported that she was not doing well. (R. at 249.) She reported waking up feeling anxious, nervous and tense. (R. at 249.) She reported having two to three panic attacks a day. (R. at 249.)

On January 17, 2002, Grubb-Hall's attorney requested that a mental evaluation be performed. (R. at 250-52.) E. Wayne Sloop, Ph.D., a psychologist, and Fiebig performed the evaluation. (R. at 251-52.) The Wechsler Adult Intelligence Scale-III, ("WAIS-III"), test was administered, and Grubb-Hall obtained a verbal IQ score of 80, a performance IQ score of 84 and a full-scale IQ score of 80. (R. at 250.) The Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), test was performed and showed that Grubb-Hall suffered from severe anxiety. (R. at 251.) On March 27,

2002, Grubb-Hall reported that she was nervous and uncomfortable around people. (R. at 247.) Dr. Abeleda reported that Grubb-Hall seemed quite comfortable in the waiting room conversing with another patient despite her complaints of being uncomfortable around people. (R. at 247.) Dr. Abeleda reported that Grubb-Hall was coherent and goal directed, her insight was good and her memory and judgment were intact. (R. at 247.)

On December 7, 2000, Grubb-Hall was referred to the Brock Hughes Free Clinic by Dr. Abeleda for an echocardiogram. (R. at 205.) The echocardiogram showed trivial mitral regurgitation without evidence of prolapsed mitral valve. (R. at 207.) Grubb-Hall was diagnosed with hypertension. (R. at 205.) On January 11, 2001, it was reported that her hypertension had improved. (R. at 206.)

On March 28, 2001, Grubb-Hall was admitted to Southwestern Virginia Mental Health Institute for depression. (R. at 213-21.) She reported thoughts of hurting herself. (R. at 213.) On examination, she had full range of motion in all extremities and a normal gait. (R. at 221.) She was assessed a GAF score of 25.[7] (R. at at 220.) She was discharged on April 5, 2001, with a diagnosis of depressive disorder, not otherwise specified, and an adjustment disorder with depressed mood. (R. at 213, 216.) It was indicated that Grubb-Hall had a GAF score of 50[8] on discharge. (R. at 216.)

---

[7] A GAF of 21-30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment ... OR inability to function in almost all areas...." DSM-IV at 32.

[8] A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

-11-

On July 26, 2001, Dr. Elizabeth Gonda, D.P.M., a podiatrist, examined Grubb-Hall for her complaints of right heel pain. (R. at 303.) X-rays showed a plantar calcaneal spur. (R. at 303-04.) Examination showed moderate to severe tenderness with palpation along the plantar medial aspect of the right heel. (R. at 303.) Muscle strength was normal without obvious deficit or weakness. (R. at 303.) Grubb-Hall received a corticosteroid injection and was advised to continue limited activities and to use supportive shoe gear. (R. at 303.)

On August 8, 2001, Marshall Tessnear, Ph.D., a psychologist, completed a mental assessment indicating that Grubb-Hall had moderate[9] limitations in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual, to sustain an ordinary routine without supervision, to work with or near others without being distracted by them, to complete a normal workday and work week, to perform at a consistent pace, to interact appropriately with co-workers and to respond appropriately to work pressures. (R. at 244-46.) He indicated that she was severely limited, but not precluded, in her ability to interact appropriately with the public. (R. at 244.) Tessnear reported that Grubb-Hall had mild to moderate limitations in her ability to interact appropriately with supervisors. (R. at 245.) He reported that she had a moderate to severe limitation in her ability to understand, remember and carry out detailed and complex instructions. (R. at 244.) Tessnear reported that these limitations were in effect beginning May 2001. (R. at 246.)

---

[9]Moderate is defined as "... moderate limitation in this area but the individual is still able to function satisfactorily." (R. at 244.)

On October 17, 2001, Grubb-Hall was seen at Wythe Medical Associates for complaints of left knee pain and weakness. (R. at 291.) X-rays of Grubb-Hall's left knee showed small joint effusion. (R. at 301.) She was diagnosed with left knee strain and early osteoarthritis. (R. at 291.) On February 20, 2002, Grubb-Hall complained of fatigue, abdominal discomfort and stress incontinence. (R. at 290.) On March 21, 2002, Grubb-Hall reported that she was doing much better since taking medications. (R. at 288.) She was diagnosed with gastroesphageal reflux disease, osteoarthritis, depressive disorder and mild hypertension. (R. at 288.) On April 22, 2002, she again reported that she was feeling much better since taking medications. (R. at 287.) She was diagnosed with gastroesphageal reflux disease and stress incontinence. (R. at 287.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is

-13-

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 8, 2001, the ALJ denied Grubb-Hall's claims. (R. at 15-25.) The ALJ found that the medical evidence established that Grubb-Hall suffered from severe impairments, namely a panic disorder and a depressive disorder, but he found that Grubb-Hall did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ found that Grubb-Hall was disabled from March 27, 2000, through April 30, 2001, but that she was not disabled under the Act thereafter. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless*

-14-

*Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Grubb-Hall argues that the ALJ's decision that she is not disabled effective May 1, 2001, is not supported by substantial evidence of record. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.) Grubb-Hall argues that the ALJ erred by relying on the testimony of Tessnear rather than giving controlling weight to her treating psychiatrist, Dr. Abeleda. (Plaintiff's Brief at 5-6.) She also argues that the ALJ erred by relying upon the response to a hypothetical question posed to the vocational expert that did not include all of the facts. (Plaintiff's Brief at 7.) Grubb-Hall argues that the ALJ erred by failing to consider the combined effect of all her impairments in finding her not disabled.[10] (Plaintiff's Brief at 7.)

---

[10]While Grubb-Hall asserts that the ALJ erred by not considering the cumulative effect of all her impairments, this assertion has no merit. (Plaintiff's Brief at 7.) The only other alleged impairment was back pain, and Grubb-Hall received no treatment for this condition since 1991. (R. at 102.)

-15-

Grubb-Hall argues that the ALJ erred by rejecting Dr. Abeleda's assessment. (Plaintiff's Brief at 5-8.) The ALJ considered Dr. Abeleda's March 28, 2001, assessment in finding that Grubb-Hall was disabled from March 27, 2000, through April 30, 2001. (R. at 19.) However, the ALJ found that as of May 1, 2001, Grubb-Hall's condition had improved. He based this finding on the GAF scores, Dr. Abeleda's findings, medical expert testimony and vocational expert testimony. (R. at 20-21.) Fiebig, the counselor who treated Grubb-Hall 14 times in 2001 and 2002, gave Grubb-Hall GAF scores ranging between 60 and 68. (R. at 224-30, 253-73.) Dr. Abeleda's records after April 2001 show that Grubb-Hall had "slight" anxiety, that she was coherent and goal directed, that she was well-oriented, that her insight was fair to good, that her memory was intact, that her judgment was operationally intact, that she did not display pressured speech or flight of ideas and that she displayed no psychotic thinking. (R. at 235, 247-49, 281-84.) In October 2001, Grubb-Hall reported that she was doing much better on medication and that she no longer had mood swings, depression or suicidal ideations. (R. at 284.) In March 2002, Dr. Abeleda reported that Grubb-Hall seemed quite comfortable in the waiting room conversing with another patient despite her complaints of being uncomfortable around people. (R. at 247.)

Tessnear, the psychological expert, testified that Grubb-Hall's disability ended in April 2001 because of improvement in her condition. (R. at 345.) Tessnear completed a mental assessment, which was presented to the vocational expert. (R. at 244-46, 355.) The vocational expert recognized that Grubb-Hall could not perform all work activities, but could perform such unskilled occupations as a laundry worker, a cleaner and a kitchen helper, all of which existed in significant numbers in the national

economy. (R. at 355-56.)

For these reasons, I find that substantial evidence exists to support the ALJ's finding that Grubb-Hall was disabled from March 27, 2000, through April 30, 2001, but not thereafter.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence supports the ALJ's finding with regard to Grubb-Hall's residual functional capacity;

2. Substantial evidence supports the ALJ's finding that Grubb-Hall was disabled under the Act from March 27, 2000, through April 30, 2001; and

3. Substantial evidence exists to support the ALJ's finding that Grubb-Hall was not disabled under the Act beginning May 1, 2001.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Grubb-Hall's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 1993 & Supp. 2005):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 28th day of November 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE